UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

GUSTAVO JAVIER TAMAYO,              ) Case No. CV 15-8158-JPR
                                   )
                Petitioner,        )
                                   )
           v.                      ) MEMORANDUM OPINION AND ORDER
                                   ) DENYING PETITION FOR WRIT OF
                                   ) HABEAS CORPUS
W.L. MONTGOMERY, Warden,           )
                                   )
                Respondent.        )
_____)

**PROCEEDINGS**

On October 16, 2015, Petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody. He also consented to having a U.S. Magistrate Judge conduct all further proceedings in his case, including entering final judgment. On December 29, 2015, Respondent filed an Answer and Memorandum of Points and Authorities and consented to proceed before a Magistrate Judge. Petitioner did not file a reply.

For the reasons discussed below, the Court denies the Petition and dismisses this action with prejudice.

1

**PETITIONER'S CLAIM**

Insufficient evidence supported the gang enhancement. (Pet. at 5-7.)[1]

**BACKGROUND**

On July 16, 2012, following a joint trial with codefendant Rickey Ryan Williams,[2] Petitioner was convicted by a Los Angeles County Superior Court jury of five counts of robbery, one count of attempted robbery, and one count of conspiracy to commit robbery. (Lodged Doc. 1, 2 Clerk's Tr. at 444-59, 462-67, 491-93; Lodged Doc. 2, 4 Rep.'s Tr. at 630-35.) The jury found true various firearm and gang enhancements. (Lodged Doc. 1, 2 Clerk's Tr. at 444-59, 462-67, 491-93; Lodged Doc. 2, 4 Rep.'s Tr. at 630-35.) On September 6, 2012, the trial court sentenced Petitioner to 49 years 8 months in state prison. (Lodged Doc. 1, 2 Clerk's Tr. at 485-93; Lodged Doc. 2, 4 Rep.'s Tr. at 648-51.)

Petitioner appealed, raising the claim in the Petition. (Lodged Doc. 4.) On July 30, 2014, the court of appeal directed the trial court to amend the abstract of judgment to reduce a sentencing enhancement on the attempted-robbery conviction from three years four months to one year eight months. (Lodged Doc. 7 at 9-10.) The court of appeal otherwise affirmed the judgment. (Id. at 10.) Petitioner filed a petition for review (Lodged Doc. 8), which the California Supreme Court summarily denied on

---

[1] Because the pages of the Petition are not sequentially numbered, the Court uses the pagination from its Case Management/Electronic Case Filing system.

[2] The information named two other defendants, Emmanuel Flores and Alex Salcedo (Lodged Doc. 1, 2 Clerk's Tr. at 362), but they were not tried with Petitioner and Williams.

2

October 15, 2014 (Lodged Doc. 9).  Petitioner did not file any
state habeas petition.  (<u>See</u> Pet. at 3.)

**SUMMARY OF THE EVIDENCE**

Because Petitioner challenges the sufficiency of the
evidence, the Court has independently reviewed the state-court
record.  <u>See</u> <u>Jones v. Wood</u>, 114 F.3d 1002, 1008 (9th Cir. 1997).
Based on that review, the Court finds that the following
statement of facts from the California Court of Appeal opinion
fairly and accurately summarizes the evidence, except as
indicated.

**A. Crimes**

On Independence Day, July 4, 2010, [Petitioner] and
Alex Salcedo, another Inglewood 13 member, arrived at the
back door of a Ross Dress for Less store (Ross) on South
Alvarado in Los Angeles.  [Petitioner] brandished a gun
at the store's assistant manager and forced her to take
him to the store's cash office.  [Petitioner] and Salcedo
took between $40,000 and $50,000 from the safe, bound the
assistant manager with plastic ties, and left the store.

Two months later, on Labor Day, September 6, 2010,
at 4:43 p.m., [Petitioner] and an unidentified associate
entered a Ross store on South Figueroa in Los Angeles
wearing Domino's Pizza uniforms and carrying pizza bags.
They attempted to gain access to the back of the store,
ostensibly to set up pizzas for the employees, but when
the manager denied them access they left.

About 15 minutes later, Williams and an unidentified
older associate arrived at the Ross store on Hollywood

3

Boulevard in Los Angeles wearing Domino's Pizza uniforms and carrying pizza bags.  They told assistant manager Monica Pena they were delivering pizza ordered by the Ross corporate office to recognize the employees for working on the holiday.  The older man then dialed a number on his phone and handed it to Pena, stating it was the Ross corporate office.  After speaking to the person on the phone, Pena instructed security guard Joel Maldonado to take Williams and the other man to a break room at the back of the store near the cash office to set up the pizzas.  When they reached the back room, the older man brandished a handgun at Maldonado and instructed him to open the cash office door, but he was unable to.  He then struck Maldonado on the back of his head with the gun and told him to call another employee to open the cash office.  While this was happening, Pena went to the back for her lunch break and saw the assailants holding Maldonado against a wall.  There was blood on his neck and on the cash-office's keypad.  The perpetrators forced Pena to open the cash office, bound Maldonado with plastic ties and duct tape, instructed Pena to open the safe, and put approximately $45,000 in the pizza bags.  They then bound Pena and left.

A few minutes later, [Petitioner] and Salcedo entered a Ross store on Jefferson in Culver City dressed in Domino's Pizza uniforms, wearing latex gloves and carrying pizza bags.  They spoke with supervisor Salvador Rivera, who took them to the back office.  Salcedo handed

Rivera a phone on which he spoke with a man who said he was from the Ross corporate office. The man authorized the pizza order and instructed Rivera to check his email for payment instructions. Rivera told [Petitioner] and Salcedo to set up the pizza in the break room while he went into the main office to use a computer. [Petitioner] and Salcedo followed him in and closed the door, and [Petitioner] drew a handgun and pointed it at Rivera. [Petitioner] told Rivera he was being robbed and said they wanted only money, not to hurt him. Rivera informed [Petitioner] and Salcedo that the money was kept in a room adjacent to the office, and they all began to walk to that room. Loss prevention employee Vincent Gamez came to the back of the store to get a slice of pizza and was talking on his phone outside the office when [Petitioner], Salcedo, and Rivera exited. [Petitioner] pointed the gun at Gamez, and he and Salcedo took both men into the cash room and demanded that Rivera open the safe. After Rivera complied, Salcedo restrained him and Gamez with plastic ties. [Petitioner] took $30,000 from the safe and put it in a pizza bag, and he and Salcedo left.

**B. Investigation**

Culver City Police Detective Ryan Thompson investigated the robbery at the Ross store in Culver City. He viewed fingerprint evidence and the security camera footage from both that store and the store on Hollywood Boulevard, and based on this evidence and

5

information from undercover detectives, ultimately arrested [Petitioner] and Williams.  A search revealed a loaded firearm, several hundred dollars in cash, and two cell phones, one of which contained contact numbers for Salcedo and Emmanuel Flores, a fourth Inglewood 13 gang member.  Police later searched [Petitioner's] residence and found a Mini 14 Ruger rifle and loaded magazine, a Domino's Pizza shirt, and an insulated pizza bag.  Then they searched Flores's residence and found manuals and official papers from Ross, a "porcelain-style hand" molded into a gang sign, and various gang paraphernalia, including photographs of Flores and others making gang signs.

[Petitioner], Williams, Salcedo and Flores were all charged in the same information.  (Salcedo and Flores are not part of this appeal.)  [Petitioner] and Williams were charged with multiple counts of robbery and kidnapping for robbery, attempted robbery, conspiracy to commit robbery, and possession of an assault weapon, and it was alleged they committed the crimes for gang purposes.

**C. Expert Testimony**

Inglewood Police Officer Daniel Milchovich testified as an expert about the Inglewood 13 gang, which has roughly 350 members and four or five major cliques.  The gang claims all of Inglewood as its "turf."  Its primary activities include vandalism, robbery, carjacking, assault, including shootings, and murder.  Respect is important to the gang, and signs of disrespect would

likely result in violence.  For example, Milchovich testified that if a person who was not a member were to display a gang tattoo or hand sign, the result could be "an altercation, a fight, being jumped, being assaulted, being stabbed.  It could result in murder.  It's that serious."

Inglewood 13 gang members obtain status within the gang through various means, including committing crimes and assisting other gang members in committing crimes. Gang members commit crimes together to prove their dedication to the gang and to promoting its status, and also to decrease the chance that one perpetrator will identify another to police or testify against him at trial.

In responding to a hypothetical question based on the circumstances of this case, Milchovich opined that such a crime would have been committed for the benefit of, at the direction of, or in association with a criminal street gang.  His opinion was based on the way in which the gang members worked cooperatively to accomplish the robberies, the enhancement to the gang's reputation for violence, and the gang's ability to use the proceeds from the robberies to fund its activities. (Lodged Doc. 7 at 2-5.)

### STANDARD OF REVIEW

Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996:

An application for a writ of habeas corpus on behalf of

7

a person in custody pursuant to the judgment of a State
court shall not be granted with respect to any claim that
was adjudicated on the merits in State court proceedings
unless the adjudication of the claim — (1) resulted in a
decision that was contrary to, or involved an
unreasonable application of, clearly established Federal
law, as determined by the Supreme Court of the United
States; or (2) resulted in a decision that was based on
an unreasonable determination of the facts in light of
the evidence presented in the State court proceeding.

Under AEDPA, the "clearly established Federal law" that controls federal habeas review consists of holdings of Supreme Court cases "as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). As the Supreme Court has "repeatedly emphasized, . . . circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'" Glebe v. Frost, 135 S. Ct. 429, 431 (2014) (per curiam) (quoting § 2254(d)(1)).

Although a particular state-court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. Williams, 529 U.S. at 391, 412-13. A state-court decision is "contrary to" clearly established federal law if it either applies a rule that contradicts governing Supreme Court law or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (citation omitted). A state court need not cite or even be aware of the controlling

Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Id.

State-court decisions that are not "contrary to" Supreme Court law may be set aside on federal habeas review only "if they are not merely erroneous, but 'an <u>unreasonable</u> application' of clearly established federal law, or based on 'an <u>unreasonable</u> determination of the facts' (emphasis added)." Id. at 11 (quoting § 2254(d)). A state-court decision that correctly identifies the governing legal rule may be rejected if it unreasonably applies the rule to the facts of a particular case. <u>Williams</u>, 529 U.S. at 407-08. To obtain federal habeas relief for such an "unreasonable application," however, a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." Id. at 409-10. In other words, habeas relief is warranted only if the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Harrington v. Richter</u>, 562 U.S. 86, 103 (2011).

Here, Petitioner raised his claim on direct appeal (Lodged Doc. 4), and the court of appeal rejected it in a reasoned decision (Lodged Doc. 7). The state supreme court then summarily denied Petitioner's petition for review. (Lodged Docs. 8, 9.) The Court "looks through" the supreme court's silent denial to the court of appeal's decision as the basis for the state courts' judgment. See <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04 (1991). Because the court of appeal adjudicated the claims on the merits, the Court's review is limited by AEDPA deference. See <u>Richter</u>,

1 | 562 U.S. at 100.

2 | **DISCUSSION**

3 | **Petitioner's Sufficiency-of-the-Evidence Claim Does Not Warrant**

4 | **Habeas Relief**

5 |     Petitioner contends that insufficient evidence supported the

6 | gang enhancement. (Pet. at 5-6.)

7 |     A.   <u>Applicable Law</u>

8 |     The Due Process Clause of the 14th Amendment protects a

9 | criminal defendant from conviction "except upon proof beyond a

10 | reasonable doubt of every fact necessary to constitute the crime

11 | with which he is charged." <u>In re Winship</u>, 397 U.S. 358, 364

12 | (1970). Thus, a state prisoner who alleges that the evidence

13 | introduced at trial was insufficient to support the jury's

14 | findings states a cognizable federal habeas claim. <u>Herrera v.</u>

15 | <u>Collins</u>, 506 U.S. 390, 401-02 (1993).

16 |     In considering a sufficiency-of-the-evidence claim, a court

17 | must determine whether, "after viewing the evidence in the light

18 | most favorable to the prosecution, <u>any</u> rational trier of fact

19 | could have found the essential elements of the crime beyond a

20 | reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979)

21 | (emphasis in original). California's standard for determining

22 | the sufficiency of evidence to support a conviction is identical

23 | to the federal standard enunciated in <u>Jackson</u>. <u>People v.</u>

24 | <u>Johnson</u>, 26 Cal. 3d 557, 576 (1980). On federal habeas review, a

25 | state court's resolution of a sufficiency-of-the-evidence claim

26 | is evaluated under 28 U.S.C. § 2254(d)(1) rather than

27 | § 2254(d)(2). <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274-75 (9th Cir.

28 | 2005) (as amended).

10

1    Jackson "makes clear that it is the responsibility of the
2    jury — not the court — to decide what conclusions should be drawn
3    from evidence admitted at trial." Cavazos v. Smith, 132 S. Ct.
4    2, 3-4 (2011) (per curiam).  Thus, the reviewing court "cannot
5    second-guess the jury's credibility assessments"; such
6    determinations are "generally beyond the scope of review." Kyzar
7    v. Ryan, 780 F.3d 940, 943 (9th Cir.) (citation omitted), cert.
8    denied, 136 S. Ct. 108 (2015).
9         The reviewing court "must look to state law for 'the
10   substantive elements of the criminal offense,'" although the
11   "minimum amount of evidence that the Due Process Clause requires
12   to prove the offense is purely a matter of federal law." Coleman
13   v. Johnson, 132 S. Ct. 2060, 2064 (2012) (per curiam) (quoting
14   Jackson, 443 U.S. at 324 n.16).
15        California Penal Code section 186.22(b)(1) authorizes a
16   sentencing enhancement when a defendant commits a felony "for the
17   benefit of, at the direction of, or in association with any
18   criminal street gang" and does so "with the specific intent to
19   promote, further, or assist in any criminal conduct by gang
20   members."  The mental-state element "is unambiguous and applies
21   to any criminal conduct" by gang members, including the
22   underlying crime of conviction. People v. Albillar, 51 Cal. 4th
23   47, 66 (2010) (emphasis in original); see Emery v. Clark, 643
24   F.3d 1210, 1215 (9th Cir. 2011) (per curiam) (acknowledging that
25   Albillar rejected Ninth Circuit's earlier interpretation of law).
26   Moreover, the statute does not require "specific intent to
27   promote, further, or assist a gang"; it "requires only the
28   specific intent to promote, further, or assist criminal conduct

11

by gang members." Albillar, 51 Cal. 4th at 67 (emphases in original).  Thus, if substantial evidence shows that "the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." Id. at 68.  "'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the [section 186.22(b)(1)] gang enhancement." People v. Vang, 52 Cal. 4th 1038, 1048 (2011) (quoting Albillar, 51 Cal. 4th at 63).

B.   Relevant Background

The court of appeal rejected Petitioner's claim:

> Substantial evidence demonstrates the Ross store
> robberies were committed in association with Inglewood 13
> and for its benefit.
>
> [Petitioner and Williams] concede the evidence
> established they were Inglewood 13 members who
> intentionally committed crimes with two other members.
> This fact alone established they acted in association
> with Inglewood 13 with specific intent to assist in
> criminal conduct by gang members, which is enough to
> justify the sentencing enhancement. (People v. Morales
> (2003) 112 Cal.App.4th 1176, 1198 [jury may "reasonably
> infer the requisite association from the very fact that
> defendant committed the charged crimes in association
> with fellow gang members"].)
>
> Substantial evidence also indicated [Petitioner and
> Williams] acted for the benefit of Inglewood 13.  As

Officer Milchovich explained, respect and status are important elements of gang membership and can be earned by committing crimes with other gang members, as doing so demonstrates courage and dedication to the gang and to promoting its status. Respect and status earned by individual gang members strengthens the gang as a whole. Committing crimes with fellow gang members also increases the chances of success, because a participant may rely on the others' cooperation and on the gang's internal code to ensure that no participant will cooperate with the police. Because [Petitioner, Williams,] Salcedo[,] and Flores were all Inglewood 13 members they could rely on one another in committing the robberies. This evidence amply establishes that "defendants came together as gang members" to commit the Ross store robberies. (People v. Albillar, supra, 51 Cal.4th at p. 62 [evidence that rape was committed by three gang members in concert supported gang enhancement].)

[Petitioner and Williams] acknowledge the evidence showed they themselves benefitted from the crimes and associated with other gang members to commit them, but argue no benefit to the gang resulted because no evidence showed the gang received any robbery proceeds or its reputation was enhanced. They argue association with gang members is not association with the gang and money obtained by gang members cannot be said to have been obtained by the gang. [Petitioner and Williams] thus purport to draw a distinction between gang members and

the gang itself.  The distinction is illusory.

A gang is an association of individuals, not a tangible entity separate from the individuals.  The word "gang" is a synecdoche that identifies both the individuals and the group they make up.  Association with a gang for purposes of section 186.22 is therefore satisfied by association with at least one gang member.  Given that by statutory definition a gang may comprise as few as three individuals (§ 186.22, subd. (f)), association with three gang members necessarily supports a reasonable inference of association with the gang.

In a similar vein, money obtained by several gang members working in concert may be reasonably inferred to redound to the benefit of the gang itself.  We acknowledge that "[n]ot every crime committed by gang members is related to a gang" (People v. Albillar, supra, 51 Cal.4th at p. 60), and "it is conceivable that several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang" (People v. Morales, supra, 112 Cal.App.4th at p. 1198).  But the "typical close case is one in which one gang member, acting alone, commits a crime." (Ibid.; see, e.g., In re Daniel C. (2011) 195 Cal.App.4th 1350, 1361 [gang enhancement reversed where perpetrator acted alone]; People v. Ochoa (2009) 179 Cal.App.4th 650 [same]; People v. Ramon (2009) 175 Cal.App.4th 843 [gang enhancement reversed where two perpetrators were gang members]; In re Frank S. (2006) 141 Cal.App.4th 1192 [one perpetrator];

14

see also <u>People v. Albarran</u> (2007) 149 Cal.App.4th 214 [shooting committed by gang member and unidentified associate did not support inference that shooting was gang motivated].)  Given that a gang may consist of three individuals, evidence showing that four Inglewood 13 members received money from the Ross store robberies permitted the jury reasonably to conclude Inglewood 13 itself benefitted from them.

[Petitioner and Wiliams] argue that to show a gang benefitted from money obtained by its members the prosecution must show the money was spent on or earmarked for further criminal activity.  We disagree.  Although by definition one or more of a gang's primary activities is crime (§ 186.22, subd. (f)), that need not be its only activity, and thus the money need not be spent only to further crime to benefit the gang.

Furthermore, substantial evidence indicated Inglewood 13 received non-monetary benefits from the Ross store robberies.  As Officer Milchovich opined, robberies such as these establish and demonstrate the perpetrators' solidarity and enhance their reputations and status with one another.  Solidarity and reputation are associational phenomena, and strengthening them in individuals strengthens the association.

The gang enhancement was proper.

(Lodged Doc. 10 at 7-9.)

15

1      C.  <u>Discussion</u>

2          The court of appeal was not objectively unreasonable in

3  finding that sufficient evidence supported the gang enhancement.

4  First, ample evidence showed that Petitioner committed the

5  robberies, attempted robbery, and conspiracy to commit robbery in

6  "association with" other gang members.[3]  Milchovich testified

7  that Petitioner, Williams, Saucedo, and Flores all had tattoos

8  common to Inglewood 13 members.[4]  Photographs of Petitioner

9  making gang signs with other Inglewood 13 members, including

10 Williams, Salcedo, and Flores, were found in Flores's and

11 Petitioner's residences.  (Lodged Doc. 2, 2 Rep.'s Tr. at 102,

12 199-201, 3 Rep.'s Tr. at 208-15, 454-55.)  Petitioner, Salcedo,

13

14      [3] Although Flores was not physically present during the
15 crimes, Detective Chris Caraballo testified that he searched
   Flores's residence and found Ross manuals, documents showing that
16 Flores was once a Ross employee, and items showing his gang
   association.  (Lodged Doc. 2, 2 Rep.'s Tr. at 99-102, 105.)
17 Moreover, phone records apparently showed calls from Petitioner's
   cell phone to Flores's, which the prosecutor argued was the "fake
18 corporate number," during the robbery of one of the Ross stores.
   (<u>See, e.g.</u>, Lodged Doc. 2, 3 Rep.'s Tr. at 404-10, 451-54, 463-
19 64, 472-75, 4 Rep.'s Tr. at 535-37).  Thus, the evidence showed
   that Flores was involved in both the planning and the execution
20 of the robberies.

21      [4] (<u>See</u> Lodged Doc. 2, 3 Rep.'s Tr. at 211-13 (Petitioner had
22 tattoo of symbol for "Out of the Woods" rap label, which was a
   "common symbol among Inglewood 13 gang members," and tattoo of
23 Duke University symbol, signifying membership in Inglewood 13's
   Duke clique), 212 (Flores had "Inglewood" tattooed on stomach,
24 which was "a common tattoo . . . among Inglewood 13 gang
   members"), 215-16 (Williams had tattoos of "Out of the Woods"
25 symbol and "I.N.G.," an abbreviation for "Inglewood" and a
   "common tattoo used by Inglewood 13 gang members"), 217-19
26 (Saucedo had tattoos of "Out of the Woods" and Duke University
27 symbols; "City of Champs," referring to Inglewood and common
   tattoo among Inglewood 13 gang members; "Hyde Park," referring to
28 a street in Inglewood; and "Jimbo," his gang moniker).)

and Flores all admitted to officers that they were members of the
Inglewood 13 gang.  (Lodged Doc. 2, 2 Rep.'s Tr. at 201, 3 Rep.'s
Tr. at 216, 220-21.)  And Milchovich opined that Williams was a
member of Inglewood 13 based on his gang tattoos and the
photographs of him with other gang members.  (Lodged Doc. 2, 3
Rep.'s Tr. at 216.)  As Milchovich testified, when "four
individuals from Inglewood 13 coordinate [and] commit a crime
together, the association link is fairly obvious."  (Id. at 223.)

    The evidence also showed that Petitioner's crimes benefited
his gang.  Milchovich testified that robbery was one of Inglewood
13's primary activities (Lodged Doc. 2, 2 Rep.'s Tr. at 194) and
that gang members would generally commit crimes with someone they
knew and trusted, who would not identify or testify against them
(Lodged Doc. 2, 3 Rep.'s Tr. at 222).  In response to a
hypothetical tracking the circumstances of Petitioner's and
Williams's crimes, Milchovich testified that Inglewood 13 would
benefit from them because "[t]he more gang members in a gang
. . . are known to be violent, to commit crimes, to be
intimidators, the more of the overall respect the gang itself
gets."  (Id. at 222-23.)  He explained that

> [w]hen four gang members get together to . . . commit
> some type of crime such as a robbery, carry a gun, use
> that gun during the commission of that crime, those gang
> members . . . prove not only their dedication to the gang
> itself, but also their 100 percent dedication to
> promoting or furthering that gang's respect level or
> status.  When I talk about promoting the respect level,
> I'm talking about the respect level in both the gang

1    world itself and also out in the community.

2  (Id. at 224.)  He explained that a "secondary benefit" to the

3  gang was that proceeds from the crimes could be used to buy "more

4  weapons" or narcotics that could be sold for a profit.  (Id.)

5  And a "third benefit" was that "people in the community recognize

6  and understand the violent nature of gangs" and are afraid to

7  report crimes, act as witnesses, identify gang members, and

8  testify in court.  (Id.)  As a result, "gangs and gang members

9  are allowed to freely commit crime without involvement from law

10  enforcement."  (Id. at 224-25.)

11     Sufficient evidence also showed that Plaintiff had the

12  specific intent to promote, further, or assist criminal conduct

13  by gang members.  The evidence showed, and Petitioner does not

14  dispute, that he was a gang member; he knew that Saucedo,

15  Williams, and Flores were also gang members; and the four of them

16  conspired to commit robbery, robbed three Ross stores, and

17  attempted to rob a fourth.  That was sufficient to show that

18  Petitioner had the requisite specific intent.  See Albillar, 51

19  Cal. 4th at 68 ("if substantial evidence establishes that the

20  defendant intended to and did commit the charged felony with

21  known members of a gang, the jury may fairly infer that the

22  defendant had the specific intent to promote, further, or assist

23  criminal conduct by those gang members"); Cruz v. Gipson, 566 F.

24  App'x 587, 588-89 (9th Cir.) (finding that "[s]ufficient evidence

25  . . . supports the inference that [petitioner] knew [accomplice]

26  was a member of MS13 and intended to help [accomplice] commit the

27  robbery," and "[n]othing more is required to satisfy the specific

28  intent requirement of" § 186.22(b)(1)), cert. denied sub nom.

1  <u>Cruz v. Biter</u>, 135 S. Ct. 89 (2014); <u>Emery</u>, 643 F.3d at 1216

2  (finding that specific intent to assist in "criminal conduct by

3  gang members" may include the crimes of conviction); <u>Tran v.</u>

4  <u>Horel</u>, 446 F. App'x 859, 860-61 (9th Cir. 2011) (finding

5  sufficient evidence that petitioner acted with specific intent

6  when "the four people with whom [petitioner] committed the

7  offense were all members of a gang" and petitioner "knew that at

8  least some of the four were gang members").

9       Petitioner nevertheless contends that the evidence was

10  insufficient to support the gang enhancement because the "sole

11  evidence" in support of it was "the testimony of an investigating

12  officer who was qualified as the gang expert." (Pet. at 5; <u>see</u>

13  <u>also</u> <u>id.</u> at 6 (arguing that Milchovich "never expressly testified

14  there was an actual benefit to the gang, but rather only

15  speculated about potential benefits to the gang premised on facts

16  that were never proven").)  But such opinion evidence can be

17  sufficient to prove that particular conduct benefited a gang.

18  <u>See</u> <u>Vang</u>, 52 Cal. 4th at 1048 ("'Expert opinion that particular

19  criminal conduct benefited a gang' is not only permissible but

20  can be sufficient to support the Penal Code section 186.22,

21  subdivision (b)(1), gang enhancement." (quoting <u>Albillar</u>, 51 Cal.

22  4th at 63)); <u>see also</u> <u>Huerta v. Adams</u>, 545 F. App'x 671, 672 (9th

23  Cir. 2013) ("[Petitioner] principally disputes the prosecution's

24  use of gang-expert testimony to prove the elements of this

25  enhancement, but the jury was entitled to consider such

26  testimony, which focused on gang culture and also included

27  specific hypotheticals tailored to the facts of this case."));

28  <u>Bonilla v. Adams</u>, 423 F. App'x 738, 739-40 (9th Cir. 2011)

19

1   (rejecting sufficiency-of-evidence challenge to gang enhancement

2   when petitioner committed robbery with two other gang members and

3   expert testimony "explained in hypothetical terms how such

4   offenses could be useful to the gang as a whole"). And in any

5   event, other evidence supported the jury's finding that

6   Petitioner committed his crimes "for the benefit of, at the

7   direction of, or in association with any criminal street gang,"

8   Cal. Penal. Code § 186.22(b)(1), such as the evidence that

9   Petitioner was a member of Inglewood 13 and committed his crimes

10  with three other gang members.[5]

11      Petitioner also argues that insufficient evidence supports

12  the gang enhancement because nothing showed that he and his

13  accomplices "made their victims aware of their gang affiliation."

14  (Pet. at 5.) But Milchovich testified that "[j]ust because the

15  gang didn't say their name at the time of the crime [he] wouldn't

16  change [his] opinion" that the crimes benefited the gang.

17  (Lodged Doc. 2, 3 Rep.'s Tr. at 225.) He explained that "the

18  ultimate goal of somebody committing a crime . . . is not to get

19  caught," and that "[e]ven though they didn't say the name [of the

20

21      [5] Petitioner relies on <u>People v. Ochoa</u>, 179 Cal. App. 4th

22  650, 660 (2009), which held that "[a] gang expert['s] testimony
    alone is insufficient to find an offense gang related."  In

23  <u>Ochoa</u>, however, the evidence did not support the gang expert's
    testimony — rather, the evidence showed that the defendant acted

24  alone to rob a fast-food restaurant, with no other indication of
    gang involvement.  <u>Id.</u> at 662-63 (finding that "gang enhancement

25  cannot be sustained based solely on defendant's status as a
    member of the gang and his subsequent commission of crimes").  As

26  discussed above, here Milchovich's testimony was based on a
    hypothetical that closely tracked the circumstances of

27  Petitioner's crimes, which were committed with three other

28  Inglewood 13 gang members.

gang] to the people that are either the victims or witnesses of the crime, doesn't mean that they're still not going to gain that street credit" because gang members brag about their crimes and "[w]ord on the street spreads like wild fire." (<u>Id.</u> at 225-26.) <u>see</u> <u>Scott v. Davey</u>, No. ED CV 15-0879 RGK (AFM), 2015 WL 9684923, at *7 (C.D. Cal. Nov. 3, 2015) (rejecting petitioner's sufficiency-of-evidence challenge to gang enhancement, noting that "the absence of evidence of gang signs, utterances, clothing, or graffiti in connection with the robberies did not mean that they were not gang-related"), <u>accepted by</u> 2016 WL 107905 (C.D. Cal. Jan. 8, 2016), <u>appeal docketed</u>, No. 16-55205 (9th Cir. Feb. 10, 2016).

For all these reasons, the court of appeal was not objectively unreasonable in finding that sufficient evidence supported the gang enhancement.  Petitioner is not entitled to habeas relief.

### CONCLUSION

IT THEREFORE IS ORDERED that the Petition is DENIED and judgment be entered dismissing this action with prejudice.

DATED: <u>June 15, 2016</u>

JEAN ROSENBLUTH
U.S. MAGISTRATE JUDGE

21